## NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Petitioners,

v.

## The UNITED STATES NUCLEAR REGU-LATORY COMMISSION and the United States of America, Respondents,

### Allied General Nuclear Services, et al., Intervenors.

### Nos. 963, 1051, Dockets 75–4276, 75–4278.

United States Court of Appeals, Second Circuit.

Argued April 12, 1976.

Decided May 26, 1976.

As Amended Aug. 12, 1976.

Petition for Rehearing with Suggestion for Rehearing En Banc Denied Sept. 8, 1976.

Anthony Z. Roisman, Washington, D.C. (Roisman, Kessler & Cashdan, Washington, D.C., of counsel), and J. Gustave Speth, Washington, D.C., for petitioners Natural Resources Defense Council, Inc., and others.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City (Samuel A. Hirshowitz, First Asst. Atty. Gen., Philip Weinberg, John F. Shea, III, and Richard G. Berger, Asst. Attys. Gen., New York City, of counsel), for petitioner the State of New York.

Peter L. Strauss, Gen. Counsel, Nuclear Regulatory Commission, Washington, D.C. (Stephen F. Eilperin, Asst. Gen. Counsel, Steven P. Goldberg, Atty., Nuclear Regulatory Commission, and Peter R. Taft, Asst. Atty. Gen., and Edmund B. Clark, Atty., U. S. Dept. of Justice, Washington, D.C.), for respondents.

Bennett Boskey, Volpe, Boskey & Lyons, Washington, D.C., for intervenors Allied-General Nuclear Services, and others.

George C. Freeman, Jr., Donald P. Irwin, and James N. Christman, Richmond, Va. (Hunton, Williams, Gay & Gibson, Richmond, Va., and Alvin G. Kalmanson, New York City, of counsel), Henry V. Nickel, Michael B. Barr, Washington, D.C. (Le-Boeuf, Lamb, Leiby & MacRae, and Arvin E. Upton, Washington, D.C., of counsel), for intervenors Baltimore Gas & Electric Co., and others, Commonwealth Edison Co., and others, and The Babcock and Wilcox Co.

Robert Lowenstein, Washington, D.C. (Lowenstein, Newman, Reis & Axelrad, Maurice Axelrad, Michael A. Bauser and Linda L. Hodge, Washington, D.C., of counsel), for intervenor Nuclear Fuel Services, Inc.

Milton Waxenfeld, New York City (Weisman, Celler, Spett, Modlin, Wertheimer & Schlesinger, New York City, and Elliot S. Katz, Pittsburgh, Pa., of counsel), for intervenor Westinghouse Electric Corp.

Before CLARK, Associate Justice, and PIERCE and OWEN, District Judges.*

PIERCE, District Judge:

Petitioners Natural Resources Defense Council, Inc., five other environmental groups, and the State of New York seek review of an order of the respondent, the United States Nuclear Regulatory Commission, dated November 11, 1975 and published at 40 Fed.Reg. 53056 on November 14, 1975. The order below sets forth procedures and schedules which the Commission will follow for the completion of its generic environmental impact statement on uranium and plutonium mixed oxide fuel ("GESMO") and for the conduct of associated hearings. The order also sets forth criteria under which the Commission will proceed to grant interim licenses for commercial utilization of mixed oxide fuel related activities during the period prior to the completion of the GESMO study and the Commission's final decision on wide-scale use of mixed oxide fuel in light water nu-

---

\* Tom C. Clark, Associate Justice, United States Supreme Court, Retired, Lawrence W. Pierce, and Richard Owen, United States District Judges for the Southern District of New York, sitting by designation.

clear power reactors.[1] The November 11, 1975 order is the result of comments solicited by the Commission in response to a prior Notice on the subject of mixed oxide fuel, published at 40 Fed.Reg. 20142 (May 8, 1975). Petitioners seek review in this Court pursuant to 28 U.S.C. § 2342(4) and 42 U.S.C. § 2239.[2]

Petitioners ask this Court to set aside the Commission's November 11, 1975 order on the ground that the decision to allow interim licensing of the use of plutonium in light water reactors and interim licensing of related nuclear fuel recycle activities prior to the completion of the GESMO study, and prior to a final decision thereon, is in violation of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq.,[3] the Atomic Energy Act, 42 U.S.C. §§ 2201 et seq. and the Energy Reorganiza-

1. See 40 Fed.Reg. at 53056–57. "GESMO" is the Commission's acronym for its generic environmental statement on mixed oxide fuel. GESMO differs from a standard environmental impact statement in that it addresses the generic or overall considerations of the undertaking rather than analyzing only the isolated impact of the undertaking on one given area. As used herein, "Draft GESMO" is the preliminary report issued August 21, 1974, "Final GESMO" is the completed version of that report to be issued in 1976, and the "GESMO supplement" or the "safeguards supplement" is a complementary study of questions relating to possible sabotage, theft and diversion of plutonium, undertaken by the Commission in response to the request of the Council on Environmental Quality. Neither the Final GESMO nor the GESMO supplement have yet been issued.

2. 28 U.S.C. § 2342 provides in part as follows: "The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—
   \*   \*   \*   \*   \*   \*
   "(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42 . . . .."
   42 U.S.C. § 2239 provides as follows:
   "(a) In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees, and in any proceeding for the payment of compensation, an award or royalties under sections 2183, 2187, 2236(c) or 2238 of this title, the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding. The Commission shall hold a hearing after thirty days' notice and publication once in the Federal Register, on each application under section 2133 or 2134(b) of this title for a construction permit for a facility, and on any application under section 2134(c) of this title for a construction permit for a testing facility. In cases where such a construction permit has been issued following the holding of such a hearing, the Commission may, in the absence of a request therefor by any person whose interest may be affected, issue an operating license or an amendment to a construction permit or an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for an amendment to a construction permit or an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.
   "(b) Any final order entered in any proceeding of the kind specified in subsection (a) of this section shall be subject to judicial review in the manner prescribed in the Act of December 29, 1950, as amended, and to the provisions of section 10 of the Administrative Procedure Act, as amended."

3. 42 U.S.C. § 4332 provides in part as follows: "The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
   "(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;
   "(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;
   "(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
   "(i) the environmental impact of the proposed action,

tion Act of 1974, 42 U.S.C. §§ 5841 et seq. Petitioners also claim that the order violates NEPA by bifurcating the on-going environmental review, by providing that the final impact statement will be issued in two parts at different times, and by setting forth procedures whereby the environmental issues will be addressed in hearings which are to be primarily legislative rather than adjudicatory in character. The Commission urges that the order under review is not a "final order" within the meaning of 28 U.S.C. § 2342 and 42 U.S.C. § 2239, that the decision to allow interim licensing does not violate NEPA or the energy acts, and that its pronouncements concerning procedures and schedules are matters within its discretion. The intervenors, representatives of the nuclear power industry, similarly argue that the order is not "final" and that it does not violate NEPA.

We agree with petitioners that the order below is final and reviewable in this Court. We agree with the Commission that the procedures and schedules set forth in the order are matters within its discretion. However, we find that the portion of the order which allows the Commission to proceed to grant interim commercial licenses for the use of mixed oxide fuel and related activities prior to the completion of the GESMO study and the final decision on wide-scale use would allow the commencement of major federal action without the benefit of an adequate environmental impact statement. Accordingly, we conclude that the decision to proceed to interim li-

censing is in violation of the NEPA, and that portion of the order is reversed and remanded.

## I. *The Plutonium Recycle*

The vast majority of nuclear power plants presently in operation in this Nation are fueled by fissionable uranium. These reactors start with uranium-235, and through the fission process, release large amounts of energy which is used to generate electrical power. The uranium fission process produces large quantities of radioactive waste material, or "spent fuel". Because of the growing quantity of nuclear wastes and because of the fact that natural resources of uranium are limited, the federal government, in conjunction with private industry, has since 1957 investigated the potential of recycling spent fuel in order to produce a new source of nuclear energy. The Commission estimates that the cost of this research to the government alone has been in excess of 100 million dollars.

As a light water nuclear reactor operates, heat is generated from the fissioning of uranium-235 atoms in the fuel. The fission process also creates atoms of plutonium from uranium-238 atoms. For each gram of U–235 fuel consumed in the reactor, as much as 0.9 grams of fissile plutonium is formed within the fuel. Generally, more than half of the plutonium so produced is consumed in the reactor process without any external recycle, before the discharge of the spent fuel. Accordingly, all present

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
"(iii) alternatives to the proposed action,
"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environ-

mental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;
\*  \*  \*  \*  \*  \*
"(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;"

light water nuclear reactors to some extent generate and use plutonium as fuel.

The spent fuel which remains after the completion of the fission process contains elements of uranium and plutonium which, if properly separated from the waste, reprocessed, and fabricated into new nuclear fuel, would constitute a significant new source of energy. Cognizant of the nation's pressing need for new sources of energy, as well as of NEPA's mandate that natural resources be recycled so as to preserve depletable sources of energy, see 42 U.S.C. § 4331(b)(6), the Commission has undertaken a broad-scale inquiry into the commercial feasibility of plutonium recycle. According to the Commission, the nuclear power industry plans to carry out the spent fuel recycle process in a series of nine steps.[4]

The first step in the recycle is to store the spent fuel to allow for some decay of radioactivity. Certain existing nuclear plants have facilities for such storage, but the Commission reports that developing forms suitable for long-term storage of fuel wastes are presently only experimental.

Once some radioactive decay has been accomplished, the plutonium and uranium elements of the spent fuel are separated out as nitrate solutions. This step of the recycle chain must be carried out through the use of remote operating technology behind massive protective shielding. However, once the separation has been accomplished, the purified materials no longer contain the highly penetrating radiation which is present in fission products. Following separation, the uranium nitrate is converted into uranium hexafloride which is in turn enriched to increase the concentration of uranium-235. The enriched uranium hexafloride is then converted to uranium dioxide. Similarly, the plutonium nitrate is converted to plutonium oxide. The resulting materials are fabricated into fuel rods containing mixed plutonium and uranium oxides; hence the term "mixed oxide fuel".

The mixed oxide fuel rods then are fabricated into fuel elements for insertion into light water nuclear reactors converted from use of uranium to use of mixed oxide fuel. The fission wastes remaining after the separation and reprocessing must be converted to a form suitable for long-term storage. The various steps of the recycle must be achieved through transportation of the nuclear materials from light water reactors to separation and conversion facilities, to fabrication plants and back to the converted light water reactors.[5]

Three light water nuclear power reactors are presently licensed to operate with limited amounts of mixed oxide fuel. The amount of mixed oxide fuel employed ranges from less than 0.1 percent of the total fuel core in the commercial scale reactor at Quad-Cities 1, Illinois, to approximately eleven percent in the very small reactor at Big Rock Point in Michigan. Between 1966 and 1971, the Nuclear Fuel Services plant at West Valley, New York, performed separation and reprocessing of spent fuel, processing approximately 640 metric tons of spent fuel. However, that

4. "Industry plans are to carry out the spent fuel recycle process in the following steps:

(1) Store the spent fuel to allow some decay of radioactivity;

(2) Separate plutonium and uranium from fission product wastes as nitrate solutions;

(3) Convert the uranium to uranium hexafloride which is then enriched to increase the concentration of the fissile isotope uranium-235;

(4) Convert the uranium hexafloride to uranium dioxide;

(5) Convert the plutonium nitrate to plutonium oxide;

(6) Manufacture fuel rods with pellets containing mixed plutonium and uranium oxides;

(7) Fabricate fuel elements containing fuel rods of mixed oxide fuel;

(8) Convert the fission product wastes into forms suitable for long term storage;

(9) Transport materials as required by the above processing, production, or storage operations."

(40 Fed.Reg. at 53059)

5. The Energy Reorganization Act of 1974 requires, inter alia, that the Commission evaluate and compare the respective environmental impact of separate versus grouped siting of nuclear fuel recycle facilities; see 42 U.S.C. § 5847. However, even if such facilities were grouped, transportation of plutonium would be required to converted facilities and for storage purposes.

plant is presently shut down. A few presently operating plants produce very limited amounts of mixed oxide fuel; the quantity involved is but a small proportion of that which would be utilized through wide-scale use.

Presently pending before the Commission are a number of applications to undertake different steps of the plutonium recycle process. Nuclear Fuel Services has applied for permission to alter and expand its existing plant; Allied-General Nuclear Services seeks licensing of proposed separations and uranium conversion facilities presently under construction at Barnwell, South Carolina; and Westinghouse Electric Corporation has applied for a license to undertake mixed oxide fuel fabrication at a proposed plant near Anderson, South Carolina.[6] Other firms have expressed interest in undertaking plutonium related activities.

## II. *Prior Proceedings*

As the nuclear power industry proceeds with plans for the implementation of the plutonium recycle, environmental concerns are properly addressed by the licensing agency. Cognizant of its responsibilities, the Commission's predecessor, the Atomic Energy Commission, announced on February 12, 1974, that a generic environmental impact statement (GESMO) would be prepared prior to a Commission decision on the wide-scale use of mixed oxide fuel; see 39 Fed.Reg. 5356.

GESMO is intended to be a comprehensive NEPA evaluation of mixed oxide fuel examining such essential issues as nationwide environmental impact, adverse environmental effects, safeguards against adverse effects and alternatives to the proposed recycle activities. On August 21, 1974, GESMO was issued in draft form, and the draft circulated among the various interested agencies of the federal government. Draft GESMO concluded that the Commission should proceed to license wide-scale use of mixed oxide fuel, that environ-

mental considerations would not be adversely effected, and that the use of plutonium recycle would serve not only to lessen the demand on limited reserves of uranium but would also present a partial solution to the problems of radioactive wastes. Draft GESMO, issued in four volumes and in excess of six hundred pages, can be described as a massive scientific inquiry into the question of plutonium recycle. Draft GESMO analyzes the background of scientific experience with plutonium and projects a wide-scale plutonium recycle industry by the year 1990. The study analyzes the expected environmental impact of the use of mixed oxide fuel in light water reactors, of the fabrication of mixed oxide fuel, of reprocessing facilities and of the supporting uranium fuel cycle. A significant section is devoted to the transportation of radioactive materials and to the problems of radioactive waste management and storage of plutonium. Draft GESMO also undertook to evaluate the effects of radiation on public health and to describe possible fuel and plant protection. Two chapters of the study are devoted to probable adverse environmental effects which cannot be avoided and to methods to limit such effects. Draft GESMO investigated alternative dispositions of plutonium, including storage, immediate use, and a permanent ban on use, presenting a cost-benefit analysis of each alternative disposition.

Despite this herculean undertaking, it is immediately apparent that Draft GESMO did not fully address alternatives to the plutonium recycle industry. There is no significant discussion of any methods of energy production other than nuclear. Further, Draft GESMO did not reach any final conclusions on the question of safeguards. At the time of Draft GESMO's release, the Commission planned to issue a supplemental statement on safeguards.[7]

On January 20, 1975, the President's Council on Environmental Quality ("CEQ"), by letter, informed the Commission that in

---

6. See Nuclear Regulatory Commission Docket Nos. 50–201, 50–332, and 70–1729; 40 Fed.Reg. at 53059.

7. See 40 Fed.Reg. at 53058.

its opinion Draft GESMO was inadequate, particularly since it failed to address adequately the special dangers of sabotage and theft posed by large-scale transportation of plutonium materials. The CEQ recommended that these special problems be addressed before any final decision on wide-scale use. Further, the CEQ directed the Commission to avoid taking any licensing steps in the interim period which could result in the foreclosure of alternative safeguards or which could result in unnecessary "grandfathering" of existing facilities' safeguards systems.

Looking toward compliance, the Commission on May 8, 1975 announced provisional decisions on certain procedures which it would employ in the ongoing inquiry into plutonium related activities. The Commission invited public comment on its provisional decisions regarding licensing policy, which were as follows:

"(1) A cost-benefit analysis of alternative safeguards programs should be prepared and set forth in draft and final environmental statements before a Commission decision is reached on wide-scale use of mixed oxide fuels in light water nuclear power reactors.

"(2) *There should be no additional licenses granted for use of mixed oxide fuel in light water nuclear power reactors in the interim prior to the decision on wide-scale use except for experimental purposes;* and

"(3) With respect to light water nuclear power reactor fuel cycle activities (activities other than nuclear power reactor construction and operation) which depend for their justification on wide-scale use of mixed oxide fuel in light water nuclear reactors, *there should be no additional licenses granted in the interim which would foreclose future safeguards options or result in unnecessary 'grandfathering'.* This would not preclude the granting of licenses in the interim for experimental and-or technical feasibility purposes." (40 Fed.Reg. at 20142, as quoted at 40 Fed.Reg. at 53058) (Emphasis supplied.)

In response to its invitation in this May 8, 1975 Notice, the Commission received in excess of two hundred comments and inquiries from government agencies, public officials, environmental groups, industry spokesmen, and private individuals. By letter, the Environmental Protection Agency supported the proposed total ban on commercial licensing until after a final decision implementing on adequate safeguards program. (See Jnt.App. at 237). The Federal Energy Administration recommended that the Commission license only facilities for "commercial demonstration purposes" in the interim period, or that the Commission bar only fuel fabrication and plant use. (See *Id.* at 182.)

Comments received from the nuclear power industry recommended generally that the Commission proceed to interim licensing of certain restricted activities prior to the final decision on GESMO. Consumers Power Company, a licensee of two plants, stated that a delay of plutonium licensing until 1978 would cost it six million dollars in additional outlays for enriched uranium and would cost the entire nuclear industry some thirty-five to fifty million dollars for spent fuel storage. (See Jnt. App. at 209.) Despite the industry's apparent desire to proceed with plutonium activities, a number of firms expressed concern over the problems of plutonium transportation. For example, Northeast Nuclear Energy Co. urged that military guards be provided for the recycle process and particularly for the transportation step. (See Jnt. App. at 207.) General Atomic Company stated that "transportation is the weakest link of any safeguards chain" and set forth reasons why the transportation of plutonium posed greater hazards than the transportation of highly enriched uranium. (See Jnt.App. at 219.)

III. *The November 11, 1975 Decision*

Following receipt of comments and limited hearings held during the comments period, the Commission issued the November 11, 1975 order which is now under review. In essence, through that decision the Commission reversed its earlier position of May

8, 1975 and concluded that certain interim commercial licensing *should* be allowed. The order also set forth procedures for hearings on the final version of the GESMO study to be issued in 1976 and for hearings on the safeguards supplement to GESMO also presently being prepared.

The procedures set forth were geared to the Commission's estimate that it would issue Final GESMO in "early 1976" and the safeguards supplement in "mid-1976." The Commission had also estimated that it could conclude the GESMO hearings by the end of 1976. However, at argument, counsel for the Commission stated that there had been "some slippage" in this time schedule.

The November 11, 1975 order provides that the Commission will proceed to hold hearings on the GESMO study in the following manner once each segment of the study is released in its final form:

"The Commission will establish a board to preside at those hearings. The hearing board will be expected to establish reasonable time limits for the conduct of the proceedings. All direct testimony for the legislative-type hearings will be filed in advance. The board will be expected to question witnesses and participants will be permitted to suggest questions to the board, but there will not be direct cross-examination of participants by other participants.

"It may be that some factual issues cannot be resolved adequately on the basis of a record developed in this manner. [After the legislative-type hearings,] participants will have the opportunity to identify any such issues of fact for which direct cross-examination by the participants is needed for a sound decision. [The participant] will be expected to demonstrate why the legislative-type procedures have

not proved adequate." (40 Fed.Reg. at 53060.)

The November 11, 1975, order also addressed the question of the extent to which the Commission should undertake review of individual license applications prior to the GESMO hearings and the final decision on mixed oxide fuel. The Commission determined that its staff should continue to review applications but that the staff should analyze only those questions not being addressed in GESMO. The staff reviews will be supplemented thereafter following the final decision on wide-scale use.

Public hearings on pending license applications will be conducted only in the Commission's discretion, upon a consideration of the following factors:

"(1) the degree of likelihood that any early findings on the issue(s) would retain their validity following the Commission's final decision on wide-scale use of mixed oxide fuel and implementing regulations; and

"(2) the possible effect upon the public interest and the litigants in having an early, if not necessarily conclusive, resolution of the issue(s)." (40 Fed.Reg. at 53061.)

Such hearings, if held, would be adjudicatory in character as are the Commission's licensing proceedings in most cases. Further, each licensing proceeding will provide its own local environmental impact statement; *however, the Commission in one case has ruled that those statements need not address the environmental issues being treated in the GESMO study.*[8]

In the words of the agency's order, "The Commission has concluded that interim licensing may be issued for fuel recycle related activities . . . ."

"While the Commission is properly mindful that certain licensing actions have the

---

**8.** See 40 Fed.Reg. at 53060–63. This position was set forth clearly by the Commission's decision *In the Matter of Consumers Power Company* (Big Rock Point Nuclear Plant) Docket No. 50–155, NRCI–75/8, CLI–75–10, p. 188. "The scope of the NEPA review in this case should, of course, be tailored to the possible environmental impact resulting from increasing

the amount of plutonium in this one reactor . . . .. Discussion of possible adverse environmental effects and alternatives to the proposed action can be limited accordingly. The statement need not, for example, discuss alternatives to plutonium recycle and other generic matters properly treated in GESMO." *Id.* at 190.

potential for foreclosing subsequent alternatives, it cannot disregard the equally hard reality that inaction or a blanket prohibition on fuel recycle related licensing actions could also foreclose or substantially impede realization of energy alternatives which may contribute significantly to meeting national needs." (40 Fed.Reg. at 53061.)

As bases for this reversal of its position of May 8, 1975, the Commission set forth its belief that any environmental or health aspects of interim activity can be adequately addressed through interim reviews and that interim licensing will not foreclose any significant health, safety or environmental alternatives.

It is important to note what is encompassed by the term "interim activity". The Commission will allow separation of plutonium and uranium from fuel wastes; it will allow reprocessing of the fuel into forms suitable for use; it will allow fabrication of mixed oxide fuel; it will permit use of mixed oxide fuel in presently existing light water reactors; it will license plant construction to achieve the foregoing steps; and it will permit the transportation, including international transportation, of mixed oxide fuel in its various processing stages. All of the foregoing activities will be allowed on a commercial-scale level. The order expressly states that "no limits will be placed on the number of light water reactors for which . . . authorization [to convert from use of uranium to plutonium] may be granted." (40 Fed.Reg. at 53062.) In addition, the order does not state that there will be any limits on the other recycle activities allowed in the period prior to the final decision on GESMO.

Certain of the above interim activities will be permitted upon the application of special interim eligibility criteria. The special criteria will not be applied to the use of mixed oxide fuel in presently existing power plants or to the transportation of plutonium materials. The Commission concluded that conversion of light water reactors to mixed oxide fuel need not be subject to special standards because such conversion does not require significant design changes and because such conversion is reversible in the event that the final decision is adverse to the wide-scale use of mixed oxide fuel. The transportation of plutonium will be allowed without application of special standards in light of the Commission's view that such transportation would be constrained by practical limitations and in light of the Commission's belief that such limited transportation would not present factors which are not already present in the existing transportation of enriched uranium.

Accordingly, the interim eligibility criteria will apply only to individual applications for interim licenses for commercial fuel reprocessing and mixed oxide fuel fabrication. The interim standards are as follows:

"(1) Whether the activity can be justified, from a NEPA cost-benefit standpoint, without placing primary reliance on an anticipated favorable Commission decision on wide-scale use of mixed oxide fuel;

"(2) Whether the activity would give rise to an irreversible and irretrievable commitment of resources that would unjustifiably foreclose for the activity substantial safeguard alternatives that may result from the decision on wide-scale use; and

"(3) The effect of delay in the conduct of the activity on the overall public interest." (40 Fed.Reg. at 53062.)

These criteria, combined with consideration of Draft GESMO, led the Commission to conclude that interim licensing

"is not likely to result in such a substantial further commitment of resources that the final decision on the costs and benefits of the public health and safety and environmental aspects of wide-scale use of mixed oxide fuel would be significantly affected or that generic determinations on such aspects would be foreclosed." (40 Fed.Reg. at 53061.)

Finally, the Commission also concluded that a refusal to allow interim commercial activity would result in "the disruption or cessation of planning as well as the production of useful data," and might result in

"economic penalties on the American public through increased costs to electrical utilities caused by delaying the use of resources available in spent fuel . . .." (*Id.*)

The order of the Commission also addressed safeguards which will be required in the interim period. In essence, only those safeguards presently required by law will be imposed (See 10 C.F.R. Parts 70 and 73), although the Commission has stated that it is considering certain new and additional safeguards. According to the order, final requirements for safeguards in the interim period will be announced at the same time as the issuance of Final GESMO.

## IV. *Reviewability*

The first question which must be addressed is whether the November 11, 1975 decision of the Commission is a final order reviewable in this court. Petitioners urge that jurisdiction to review is present pursuant to 28 U.S.C. § 2342(4), which grants to this court exclusive jurisdiction to enjoin, set aside, suspend in whole or in part, or to determine the validity of all final orders of the Nuclear Regulatory Commission made reviewable by section 2239 of Title 42. Petitioners state that the order below is a final order entered in a Commission proceeding for the issuance or modification of rules and regulations dealing with the activities of nuclear power licensees; see 42 U.S.C. § 2239(a) and (b).[9] Petitioners also argue that this court has jurisdiction to review a decision of an agency implementing NEPA or refusing to refrain from licensing until the filing of an impact statement. See *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1094 (1973). Further, it is urged that we may properly review agency criteria for upcoming licensing proceedings; see *Coalition for Safe Nuclear Power v. Atomic Energy Commission,* 150 U.S.App.D.C. 118, 463 F.2d 954 (1972) (per curiam).

Respondents argue that the November 11, 1975 order is not reviewable, since it grants no licenses and simply sets forth licensing criteria for future proceedings; see *Citizens for a Safe Environment v. Atomic Energy Commission,* 489 F.2d 1018, 1021 (3d Cir. 1973). Respondents also cite the rule that an agency's procedural or evidentiary rulings made in the course of a licensing proceeding are not reviewable except in extraordinary circumstances not present here; see *Ecology Action v. Atomic Energy Commission,* 492 F.2d 998, 1001 (2d Cir. 1974).

■ The cases relied upon by respondent for the proposition that the order below is not reviewable relate primarily to refusals to review agency rulings made in the course of an individual licensing proceeding; see *Ecology Action, supra; Citizens for a Safe Environment, supra; Thermal Ecology Must be Preserved v. Atomic Energy Commission,* 139 U.S.App.D.C. 366, 433 F.2d 524, 525–26 (1970) (per curiam). These cases are not dispositive here for two reasons. First, this court has on occasion reviewed essentially "interlocutory" rulings made by an agency in a NEPA proceeding; see *Greene County Planning Board v. Federal Power Commission (Greene I),* 455 F.2d 412, 425 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). More fundamentally, petitioners here do not seek review from an order entered in the course of an individual licensing proceeding; rather, the regulations challenged here will apply to *all* interim licensing proceedings, as well as to the GESMO hearings; see *Harlem Valley Transportation Association v. Stafford,* 500 F.2d 328, 334–35 (2d Cir. 1974).

■ Initially, we note that no distinction exists for review purposes between agency adjudications and other pronouncements, such as rulemaking; see *Pacific Gas & Electric v. Federal Power Commission,* 164 U.S. App.D.C. 371, 506 F.2d 33, 48 (1974); *Gage v. Atomic Energy Commission,* 156 U.S. App.D.C. 231, 479 F.2d 1214 (1973). It is clear that the decision below is essentially an exercise in rulemaking.

■ To determine finality, the appropriate inquiry is whether the process of

---

9. See note 2, *supra.*

administrative decision-making has reached a stage where judicial review will not be disruptive of the agency process and whether legal consequences will flow from the action taken; see *Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970). This test is satisfied here since the Commission has made a final decision, after months of consideration, to the effect that it may proceed to interim licensing of mixed oxide fuel related activities without awaiting the release of Final GESMO or a final decision on wide-scale use. Further, it is clear that NEPA legal consequences flow from that decision since the order below sets forth rules concerning how the agency will comply with the environmental laws. Review at such a stage is proper; see *Harlem Valley, supra; Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission,* 146 U.S.App. D.C. 33, 449 F.2d 1109 (1971). Review at this juncture will not disrupt agency proceedings:

> "Here there is no specific proceeding to disrupt since we are concerned with a rule that is applied to all [Commission] proceedings, and the [Commission] has determined, as it views them, its obligations under NEPA." (*Harlem Valley, supra,* at 334.)

■ In this case the agency has issued proposed rules, invited and received comments, and issued finalized rules. Review by this court is proper, even though no licenses have been granted or denied and even though the rules relate only to licensing standards; see *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 198, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). Agency decisions are ripe for this court's consideration when the issues and the record are suitable for review and the agency decision has an immediate and significant impact; see *Pacific Gas & Electric, supra.* This test is satisfied since the court is presented with an administrative record of more than fif-

teen hundred pages, as well as the Draft GESMO, and the May 8, 1975 and November 11, 1975 decisions of the Commission; the NEPA issues are clear and the decision to proceed to commercial interim licensing has an immediate and significant impact on the Commission's future course of action.

■ In urging that the controversy herein is not ripe for judicial review respondents rely upon cases which deal with review pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; [10] however, it appears that APA standards are not applicable in a proceeding such as this one where judicial review is sought in this court directly from the agency decision, rather than initially in the district court; see *Greene County Planning Board v. Federal Power Commission (Greene III),* 528 F.2d 38, 46 (2d Cir. 1975). But even if the APA standards for ripeness are applied, the procedural issues are ripe for review since the substantive NEPA questions are suitable for judicial consideration and since the hardship to all parties would be considerable if review were denied at this time and it was later determined that the Commission's guidelines led to fundamental flaws in the environmental inquiry. The Supreme Court has indicated that the analysis of whether agency action is ripe for review should be a flexible one; see *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–50, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and in the past this court has noted the problems which could result were we to take an inflexible approach to review; see *Greene I, supra;* see also *Citizens for a Safe Environment, supra.*

The impact of the Commission's decision is highly significant, for it sets the course for the commercial introduction of a new nuclear technology. Upon consideration of all the foregoing principles, we conclude that the November 11, 1975 order is a final order which issues regulations in a proceed-

**10.** A proceeding made reviewable by 42 U.S.C. § 2239, see note 2 *supra,* may be reviewed in this court under 28 U.S.C. § 2342 or in the district court under 5 U.S.C. § 702; see 42 U.S.C. § 2239(b).

ing under 42 U.S.C. § 2239(a) and (b) and that this court has jurisdiction pursuant to 28 U.S.C. § 2342(4).

## V. Procedures for the GESMO and related hearings

Petitioners ask this court to declare the procedural guidelines set forth in the November 11, 1975 notice violative of NEPA's direction that federal agencies

"utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment." (42 U.S.C. § 4332(2)(A).)

The essence of petitioners' objection to the procedural guidelines is that the Commission, by separating the GESMO hearings into two parts and by separating local from generic issues, has so fragmented the environmental inquiry that the study will not be sufficiently integrated or interdisciplinary. Further, petitioners claim that the decision to proceed through primarily legislative-type hearings on GESMO and through staff reviews on individual applications, allowing hearings of an adjudicatory nature only in limited circumstances, is contrary to NEPA and to 42 U.S.C. § 2239(a), which deals with Commission licensing hearings.

■ It is a long established principle that a federal agency has discretion whether to proceed by rulemaking or by adjudication; see *Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Morningside Renewal Council, Inc. v. Atomic Energy Commission*, 482 F.2d 234 (2d Cir. 1973), cert. denied, 417 U.S. 951, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). An agency has broad latitude to determine in what order, in what forum, and by what procedures it will tackle a complex subject matter. The courts cannot direct the Commission to decide its cases in a particular order, see *Federal Communications Commission v. WJR*, 337 U.S. 265, 272, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949); only Congress could confer such a priority; see *Federal Communica-*

tions Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 145, 60 S.Ct. 437, 84 L.Ed. 656 (1940). There is no dispute that the GESMO inquiry presents difficult and complex questions. As stated by the Supreme Court, "[w]e can see no justification for denying the Commission reasonable latitude to decide where it will resolve these complex issues, in addition to how it will resolve them." *American Commercial Lines v. Louisville & Nashville R.R.*, 392 U.S. 571, 592, 88 S.Ct. 2105, 2116, 20 L.Ed.2d 1289 (1968). This reasonable latitude extends to the methods which the agency employs and to the scope of proceedings which the agency will undertake; id; see also *The Permian Basin Area Rate Cases*, 390 U.S. 747, 776, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

■ NEPA does not require extensive administrative proceedings; neither the Administrative Procedure Act nor the environmental laws compel an agency to appoint an examiner and conduct hearings; see *National Helium Corp. v. Morton*, 455 F.2d 650, 656–57 (10th Cir. 1971). Indeed, the text of NEPA does not require agency hearings, see 42 U.S.C. §§ 4321–4347, and courts have refused to read such a requirement into the statute; see *Lathan v. Brinegar*, 506 F.2d 677, 689 (9th Cir. 1974); *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1286 (9th Cir. 1973).

It is true that certain decisions have expressed a concern that issues of great importance be accompanied by expanded procedural rights, and that limited cross-examination be afforded on crucial issues raised in the agency proceeding; see *Appalachian Power Co. v. Environmental Protection Agency*, 477 F.2d 495, 503 (4th Cir. 1973); *O'Donnell v. Shaffer*, 160 U.S.App.D.C. 266, 491 F.2d 59, 62 (1974); *Greene I, supra*, 455 F.2d at 422. The philosophy of these cases is applicable herein in light of the magnitude and the gravity of the Commission's inquiry.

"The choice is not between a full trial-type hearing and no public proceeding at all. The goal is rather to insure that administrators provide a 'framework for principled decision-making'—a frame-

work that is appropriate for the issue at hand." (*O'Donnell v. Shaffer, supra,* 491 F.2d at 62, quoting *Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S. App.D.C. 74, 439 F.2d 584, 598 (1971).)

In its rulemaking order below, the Commission has determined that the GESMO hearings will be primarily legislative in character and that adjudicatory hearings will be held if a need for such proceedings is demonstrated. While direct cross-examination will not be allowed in the legislative phase, the participants will be permitted to submit questions for the witnesses through the hearing board. Direct cross-examination will be permitted in the adjudicatory hearings, if any, which follow. We believe that these procedures are reasonable, and note that nearly identical guidelines were upheld as adequate in *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 478 F.2d 615 (1973). In that decision the Court of Appeals for the District of Columbia Circuit observed that "in a situation where 'general policy' is the focal question, a legislative-type hearing is appropriate." *Id.* at 630. The court assessed the procedural limitations imposed by the Environmental Protection Agency in terms equally applicable to this case:

"In context, we consider that the technique, adopted by EPA, of pre-screening written questions submitted in advance is reasonable and comports with basic fairness as the general procedure. This approach permits screening by the hearing officer so as to avoid irrelevance and repetition, permits a reasonable estimate of the time required for the questioning, and aids scheduling and allocation of available time among various participants and interests. . . . [A] right of cross-examination, consistent with time limitations, might well extend to particular cases of need, on critical points where the general procedure proved inadequate to probe 'soft' and sensitive subjects and witnesses." (*Id.* at 631.)

We interpret the Commission's rules to provide for just such a procedure. We would expect that an opportunity for cross-examination will be afforded upon a threshold showing that the legislative procedures have been inadequate. While the Commission need not allow the GESMO hearings to become a forum for the individual environmental philosophies of every participant, we would expect that it will endeavor to allow meaningful participation by the public interest groups whose limited resources often relegate them to the role of contesting the studies and conclusions of industry participants. Cross-examination has been described as the most effective method through which to locate factual truth; we expect that this powerful procedural device will be appropriately utilized in a study as important as the GESMO.

Decisions regarding these matters of procedure repose in the sound discretion of the Commission. Similarly, we believe that the Commission's decision to bifurcate the hearings between GESMO and the individual licensing proceedings is well within its reasonable latitude to control its docket. So long as each final decision on any major federal action, individual or generic, comports within the requirements of NEPA and the other regulations required by the energy acts, it matters not whether certain issues are addressed in the broadscale inquiry and others in limited individual proceedings; see *Scientists' Institute, supra,* 481 F.2d at 1092–93. Because we conclude herein that no commercial licensing will be allowed in the interim period before the completion of the GESMO inquiry, the Commission's fragmentation of the environmental inquiry will not destroy the integrated and interdisciplinary approach envisioned by NEPA; rather, it will probably result in considerable administrative efficiency and avoid needless duplication. If the Commissioners have before them all relevant considerations including GESMO and all individual site factors when they decide whether to grant or deny a license, NEPA's procedures are satisfied and a court should find itself provided with an adequate record on appeal should there be judicial review.

Petitioners' final dispute with the Commission over procedure is addressed to the bifurcation of the GESMO study itself, and the decision to hold the GESMO hearings in two phases. Petitioner Natural Resources Defense Council argues that the safeguards issues to be considered by the GESMO supplement should not be separated from the other environmental and health considerations addressed by the rest of GESMO.

■ The principles of agency discretion discussed above lead us to the conclusion that the Commission should not be required to withhold Final GESMO until such time as the safeguards supplement is completed. Such a moratorium on consideration of the mixed oxide fuel issue by the Commission and the public could indeed cause needless delay and inaction. For the same reasons, we find no error in the Commission's decision to proceed with hearings on Final GESMO before the issuance of the safeguards supplement.

■ The argument that a bifurcated impact statement violates NEPA is foreclosed by the recent decision of this court in *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir. 1975). In that case Judge Mansfield, for the court, considered an impact statement which had been supplemented and concluded that

"the use of supplemental data and statements is permissible to bolster an otherwise deficient EIS or to amend an EIS to consider changes in the proposed federal action when the 'supplemental' adequately remedies the deficiency or analyses the impact of the proposed change and is properly circulated among the appropriate agencies before a final decision has been reached." (*Id.* at 91–92.)

Other decisions have invited or required supplements to impact statements, and we are aware of no decision which has held that the agency must issue the impact statement all in one piece all at one time; see *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 20 (8th Cir. 1973); *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280–81 (9th Cir. 1973); *Natural Resources*

*Defense Council, Inc. v. Morton,* 148 U.S. App.D.C. 5, 458 F.2d 827, 837 (1972).

The court assumes that the implementation of these rules will occur in a manner which will strike a proper balance between administrative efficiency and the need for a full public discussion of the complex and far-reaching question of commercial implementation of the uranium and plutonium mixed oxide fuel recycle. We conclude that the procedural guidelines set forth for the GESMO and the individual licensing hearings, the allocation of issues between generic and local inquiries, and the issuance of the GESMO in two segments, as well as the bifurcation of the GESMO hearings, are all matters within the Commission's discretion. We pass now to a review of the Commission's determination to allow interim commercial licensing.

## VI. *Interim Licensing*

In its January 20, 1975 letter to the Nuclear Regulatory Commission, the President's Council on Environmental Quality made the following observation:

"The potential impact of the diversion and illicit use of special nuclear materials are well recognized. This threat is so grave that it could determine the acceptability of plutonium recycle as a viable component of this Nation's nuclear electric power system. Thus, we believe that the NRC, the Executive Branch, the Congress, and the American people should have the benefit of a full discussion of the diversion and safeguards problem, its impacts, and potential mitigating measures, before any final decisions are made on plutonium recycle.

"The National Environmental Policy Act requires that, in preparing an environmental impact statement, the agency develop and describe appropriate alternatives where unresolved conflicts exist. Alternative safeguards programs for dealing with the threat of diversion of special nuclear materials have not yet been developed. As such, the information necessary to make sound and reasoned decisions on plutonium recycle was

not available for governmental and public consideration in the draft GESMO. Because of this, the Council believes that the draft environmental impact statement does not meet the requirements of the National Environmental Policy Act." (Attachment C to NRDC brief.)

Despite the foregoing opinion of the CEQ, the Commission has determined that Draft GESMO is an adequate statement to support its decision to license what it has referred to as "interim" activity. Petitioners urge that, despite its breadth of inquiry, Draft GESMO is as inadequate a basis for the activity envisioned as it would be for a decision on wide-scale use.

The requirements of the NEPA apply to the development of a new technology as forcefully as they apply to the construction of a single nuclear power plant. It cannot be doubted that the Congress, in enacting NEPA, intended that agencies apply its standards to the decision to introduce a new technology as well as to the decision to license related activity; see 42 U.S.C. § 4331(a) (1970); S.Rep. No. 91–296, 91st Cong., 1st Sess., 20 (1969).[11] The fact that the environmental effects of such a decision about a new technology will not emerge for years does not mean that the program does not effect the environment or that an impact statement is unnecessary; see Scientists' Institute, supra, 481 F.2d 1079, 1089–90 (discussing the technology of

the uranium breeder reactor). In numerous cases involving the commercial introduction of a new technology, as well as in cases where the agency has undertaken isolated activity which the courts found to be in actuality part of a larger program, the courts have not hesitated to identify major federal action on the broader scale and to require the preparation of a regional or generic impact statement before allowing major federal action to proceed. See Sierra Club v. Morton, 169 U.S.App.D.C. 20, 514 F.2d 856 (1975), cert. granted, 423 U.S. 1047, 96 S.Ct. 772, 46 L.Ed.2d 635, 44 U.S.L.W. 3397 (1976) (requiring a regional impact statement for coal mining in the Northern Great Plains area); Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, (Conservation Society I), 508 F.2d 927 (2d Cir. 1974), vacated and remanded, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29, 44 U.S.L.W. 3199 (1975);[12] Scientists' Institute, supra (declaratory judgment that the AEC must prepare a generic impact statement for the new technology of the breeder reactor); see also Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973). Such broad-scale impact statements may be required for a series of major federal actions, even though individual impact statements are to be prepared for each isolated project; see Sierra Club, supra, at 871; Scientists' Institute, supra. Otherwise, agencies could take an approach "akin to equating an appraisal of each tree to one

11. "The legislative history of the Act indicates that the term 'actions' refers not only to construction of particular facilities, but includes 'project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs . . .' " Scientists' Institute, supra, 481 F.2d at 1088, quoting S.Rep. No. 91–296, 91st Cong., 1st Sess., 20 (1969), U.S.Code Cong. & Admin. News 1969, p. 2751.

12. In vacating the order of this court in Conservation Society I, the Supreme Court, in a summary order, wrote that "the case is remanded to the United States Court of Appeals for the Second Circuit for further consideration in light of Pub.L. 94–83 and Aberdeen & Rockfish R. R. v. SCRAP, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975)." 423 U.S. at 809, 96 S.Ct. at 19, 46 L.Ed.2d 29, 44 U.S.L.W. at 3199. Pub.L. 94–83 amends § 102 of the NEPA and

provides that an impact statement is not inadequate solely because it is prepared by the federal agency in conjunction with preparation by state authorities; see 42 U.S.C. § 4332(D). The amendment is not relevant to this appeal, there being no issue concerning the party preparing the impact statement. On remand in Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 531 F.2d 637 (2d Cir. 1976). (Conservation Society II,) this court interpreted the decision in Aberdeen & Rockfish R. R. v. SCRAP, 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975) to hold that a broad scale impact statement is not required where the activity under review presents no irreversible or irretrievable commitment of resources. See Conservation Society II, infra, 531 F.2d 637, at 639. The applicability of SCRAP to this appeal is discussed, infra.

of the forest." *Jones v. Lynn,* 477 F.2d 885, 891 (1st Cir. 1973).

In both *Sierra Club* and *Scientists' Institute, supra,* the Court of Appeals for the District of Columbia Circuit employed a four-prong test to determine whether the action under review required a broad-scale impact statement. That test is as follows:

"[1] How likely is the program to come to fruition, and how soon will that occur?

"[2] To what extent is meaningful information presently available on the effects of implementation of the program, and of alternatives and their effects?

"[3] To what extent are irretrievable commitments being made and options precluded as refinement of the proposal progresses?

"[4] How severe will be the environmental effects if the proposal is implemented?" (*Sierra Club, supra,* at 880.)

██ Under these guidelines, the Commission's decision to initiate the GESMO study was a decision clearly mandated by NEPA. The growth of plutonium-related activities in recent years makes it clear that the nuclear power industry as a whole is steadily progressing towards the launching of a new era of commercial nuclear technology. Important environmental questions are involved in the utilization of plutonium recycle. These questions are common to the industry and transcend issues relative to the local impact of any one nuclear power plant. The existence of Draft GESMO and the preparation of the supplement demonstrate that meaningful information on the effects of implementation is available. The GESMO's limited consideration of alternatives (use plutonium now; use plutonium later; never use plutonium) demonstrates that refinement of the proposal may have already precluded other options. Finally, the record is replete with assessments of the possible adverse environmental effects, as well as the clearly hazardous consequences of theft, diversion or sabotage of plutonium.

██ Thus, NEPA clearly required the GESMO study; the principal question on this appeal is whether NEPA requires the

agency to refrain from commercial implementation until that study is complete and a final agency decision is made.

Many of the underlying questions in this inquiry are easily resolved. It is apparent that draft GESMO did not fully address alternatives to plutonium recycle or the special problems of theft, diversion and sabotage. Thus, a totally neutral application of the literal language of NEPA, specifically § 4332(C)(ii)&(iii) and § 4332(E), lead to the inescapable conclusion that Draft GESMO is a legally insufficient environmental impact statement. Previous decisions support this conclusion; the consideration of alternatives and of special hazards to the public health, safety and welfare are vital to *any* impact statement, and numerous statements have been overturned for their failure to address these questions. See, e. g., *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 92–94 (2d Cir. 1975); *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 833–34 (1972). In fact, this court has held that a consideration of alternatives is required under NEPA whenever the agency action has an environmental impact, even if no formal impact statement is filed; see *Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88, 93 (2d Cir. 1975) (requiring compliance with NEPA for federal funding of urban renewal).

██ The Commission has conceded that draft GESMO is not an adequate impact statement for wide-scale use. At the very least, the discussion of safeguards must be completed. However, the Commission proposes to proceed to commercial-scale licensing without the benefit of the safeguards supplement. The Commission has concluded that Draft GESMO, and the individual impact statements which will address issues other than those being covered by GESMO, combined with a consideration of its special eligibility criteria, will form an adequate NEPA basis for licensing decisions.

First, we note that the "interim criteria" will not be applied to the use of mixed oxide fuel or to its transportation. Thus,

the Commission will allow the nuclear power industry to create a market for mixed oxide fuel which is as large as the industry desires. Further, transportation will be unrestricted and therefore the widest possible number of persons will be exposed to the possibility of a nuclear incident before the release of the supplement on safeguards. Because the impact statements which will accompany fuel use and transportation will not consider GESMO issues, those statements cannot be adequate under NEPA.

The interim criteria which will be applied to mixed oxide fuel separation and fabrication require Commission inquiry as to whether the activity will place primary reliance on a favorable final decision in GESMO, whether the activity would foreclose safeguards alternatives by committing resources, and whether delay in the conduct of the activity would adversely effect the "overall public interest". We find these criteria at best vague and at worst disingenuous. An activity need not place primary reliance on a favorable decision on wide-scale use for the activity to severely prejudice the ultimate decision. Second, we are unable to understand how the Commission will be able to determine that a given activity will not foreclose safeguards when those safeguards have not yet been designed or finalized. Finally, the "delay" criteria injects consideration of non-environmental public interest factors which could have the effect of foreclosing the outcome of the test's application. In fact, this court has recently rejected increased cost or delay as a justification for non-compliance with the procedural dictates of NEPA; see *Conservation Society I, supra,* 508 F.2d at 933; see also *Calvert Cliffs', supra,* 449 F.2d at 1128.[13]

The only other legal argument apparently advanced by the Commission to justify its decision to license commercial activity is that the decision to proceed to interim licensing does not constitute major federal action as that term is employed by NEPA. We must consider this argument in light of the scope of activities that will be allowed, and in light of the scope of mixed oxide fuel license applications now pending before the Commission. The order below states that the Commission will allow licensing of commercial-scale separation and reprocessing, as well as of transportation and use of plutonium. The Commission has placed no numerical limitations on the number of licenses which it will grant and we have concluded that the interim licensing eligibility criteria are wholly inadequate. Thus, there is little but the word "interim" itself to distinguish the scope of activity which will be allowed from the scope of activity which would be presently possible had the Commission allowed immediate commencement of "wide-scale use".

Prior decisions have halted "interim" agency licensing activity pending the completion of a generic or regional environmental impact statement. In *Sierra Club v. Morton,* the Court of Appeals for the District of Columbia Circuit entered an order restraining most federal licensing of strip mining in a four-state area until a regional impact study was completed, despite the agency's protestation that there was in fact no broad-scale plan for the development of the entire region. More recently, in *Natural Resources Defense Council, Inc. v. Callaway, supra,* this court restrained federal dumping in the Long Island Sound until the impact statement was supplemented to address alternatives and other planned dumping projects.

In the above cases, the "interim" activity was restrained because such activity involved irretrievable commitments of re-

13. Petitioner NRDC argues that the Commission may not include public interest factors as part of a licensing decision under § 161 of the Atomic Energy Act, 42 U.S.C. § 2201; see *New Hampshire v. Atomic Energy Commission,* 406 F.2d 170, 175 (1st Cir. 1969). However, NEPA permits public interest analysis, even in a nuclear power licensing decision; see *Citizens for*

*Safe Power Inc. v. Nuclear Regulatory Commission,* 524 F.2d 1291 (D.C.Cir. 1975). Thus, consideration of the public interest is not improper so long as those factors are not permitted to outweigh environmental concerns. To the extent that the interim criteria appear to allow such a counter-balancing, we find them to be defective.

sources which would serve to tip the balance away from environmental concerns and prejudice the final agency decision. *In Conservation Society I, supra,* this court warned that we must consider the possibility that there are "options often imperceptibly foreclosed by fragmented growth," 508 F.2d at 936, and that the commitments of resources already being made "would curtail *subsequent* broad-scale assessment of alternatives." *Id.* at 935. In *Natural Resources Defense Council, Inc. v. Callaway, supra,* this court observed that it is the "cumulative environmental impact which must be evaluated as a whole." 524 F.2d at 89.

The granting of licenses to private industry is a familiar and well established example of major federal action; see *Sierra Club v. Morton, supra,* 514 F.2d at 875; *Davis v. Morton,* 469 F.2d 593 (10th Cir. 1972); *Greene I, supra; Scenic Hudson Preservation Conference v. Federal Power Commission,* 453 F.2d 463 (2d Cir. 1971); *Calvert Cliffs', supra.* Plutonium technology has never been generally licensed for commercial use; the order below gives a green light for the industry to commence planning and implementation of a second generation of atomic fuel technology.

In this factual context, the recent decision of the Supreme Court in *Aberdeen & Rockfish R.R. v. SCRAP,* 422 U.S. 289, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975) is clearly distinguishable. In that case, the Court allowed the Interstate Commerce Commission to proceed to grant "interim" railroad freight rate increases pending its completion of a NEPA study of the ICC's entire rate structure on the question of whether the rate structure discriminated against shipment of recyclables. The Supreme Court noted that the interim increase was "entirely nonfinal" and that it was facially neutral in its own environmental impact; see *Id.* at 322–26, 95 S.Ct. 2336. *SCRAP* therefore involved no irreversible commitment of resources; in fact a rate increase involves almost no commitments of resources; see *Conservation Society of South-*

*ern Vermont, Inc. v. Secretary of Transportation (Conservation Society II),* 531 F.2d 637, 638, 639–40 (2d Cir. 1976) (*per curiam* ).

This is not a case where the proposed activity has independent utility; see *Id.; Friends of the Earth v. Coleman,* 513 F.2d 295, 299–300 (9th Cir. 1975), or where the proposed interim activity is "substantially independent" of the issue of wide-scale use; see *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9th Cir. 1974). Rather, the interim activity is clearly tied to the anticipated wide-scale use and would commit substantial resources to the mixed oxide fuel technology. Here the activity which will be permitted involves construction of nuclear separation and reprocessing facilities, conversion of light water nuclear reactors to use of mixed oxide fuel, and the implementation of "interim" safeguards for the transportation of a deadly and highly radiotoxic nuclear material. Each of these steps will tip the scale towards a favorable final decision on wide-scale use. Each of these steps will move the nation towards the use of a hazardous nuclear fuel the implications of which are not fully understood. We accordingly conclude that the order below constitutes major federal action which has not been accompanied by an adequate NEPA analysis.

Taking such action before the completion of the environmental impact analysis has been branded as making a "mockery" of the procedural mandates of NEPA; see *Natural Resources Defense Council, Inc. v. Callaway, supra,* 524 F.2d at 92. As the court stated in *Scientists' Institute, supra,*

"by the time commercial feasibility of the technology is conclusively demonstrated, and the effects of application of the technology certain, the purposes of NEPA will already have been thwarted. Substantial investments will have been made in development of the technology and options will have been precluded without consideration of environmental factors." (481 F.2d at 1093–94.)

We conclude that the interim licensing envisioned by the Commission's decision

would indeed result in such a substantial further commitment of resources that the final decision on the costs and benefits of the public health and safety and environmental aspects of wide-scale use of mixed oxide fuel would be significantly affected and that generic determinations of these issues, and particularly of safeguards alternatives, could be effectively foreclosed. The Commission's conclusion to the contrary is clearly erroneous and is not supported by the record.

■ Decisions dealing with nuclear power plants have emphasized that the crucial juncture for the NEPA decision is the pre-operating license stage where construction is allowed to proceed with its attendant massive investment of capital and manpower. It is clear that plutonium technology is at that juncture and we are convinced that if the Commission is allowed to proceed in the manner set forth above, the crucial decision will have been made without compliance with NEPA. Whether or not the final decision favors wide-scale use of plutonium, the Commission's decision to allow interim commercial activities with "interim" safeguards standards is very likely to result in "grandfathering" of the existing facilities due to the expense involved in backfitting plants to add safeguards yet to be designed.

"In the language of NEPA, there is likely to be an 'irreversible and irretrievable commitment of resources,' which will inevitably restrict the Commission's options. Either the licensee will have to undergo a major expense in making alterations in a completed facility or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass." (*Calvert Cliffs'*, *supra*, 449 F.2d at 1128.)

■ We conclude that the November 11, 1975 order, insofar as it allows the Commission to grant licenses for interim commercial activity, is in violation of the NEPA. The Commission has chosen to address generic issues in a broad-scale inquiry in order to comply with the NEPA. However, by so doing, it cannot be allowed to circumvent the mandates of NEPA by granting interim licenses on the basis of records which exclude the generic aspects. While the Commission may of course grant licenses for experimental and feasibility purposes in the interim period, it must refrain from unlimited commercial licensing until after it has made a final decision on all questions presented by GESMO.

"Although an EIS may be supplemented, the critical agency decision must, of course, be made after the supplement has been circulated, considered and discussed in the light of the alternatives, not before. Otherwise the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it." (*Natural Resources Defense Council, Inc. v. Callaway, supra,* 524 F.2d at 92.)

■ It is undisputable that the motives of the Commission, to develop new sources of energy and to recycle dwindling uranium reserves, are highly commendable; however, those national needs cannot outweigh the far-reaching national concerns embodied in NEPA. "Considerations of administrative difficulty, delay or economic cost will not suffice to strip [NEPA] of its fundamental importance." *Calvert Cliffs', supra,* 449 F.2d at 1115.

■ We express no opinion on the merits of the question of wide-scale use of mixed oxide fuel. That decision is one for the Commission initially, and is not before the court. We do not conclude that the Commission must refrain from all action until the final decision on GESMO; rather, the Commission can process license applications, rule on the scope of hearings and applications for intervention, and even proceed to hold individual hearings to gather relevant data on individual site factors. All this may be undertaken before the final decision on wide-scale use, and the Commission may fully employ the bifurcated procedures which we have considered above. However, the Commission may not grant or deny applications for commercial licenses to construct or operate plutonium-related sep-

aration or reprocessing facilities, nor may it license commercial scale transportation or use of plutonium and uranium mixed oxide fuel, until the GESMO and the GESMO supplement have been issued in final form and until the Commission has made its final decision on wide-scale use of mixed oxide fuel.

■ Petitioners also argue that the order is in violation of the Atomic Energy Act, 42 U.S.C. § 2201 et seq., and the Energy Reorganization Act of 1974, 42 U.S.C. § 5841 et seq. While these contentions lend some weight to petitioners' NEPA arguments, we find that, as presented, they fail to establish independent bases to sustain an attack on the Commission's decision.[14]

The decision of the Nuclear Regulatory Commission dated November 11, 1975 is affirmed insofar as it specifies guidelines and procedures for the completion of the GESMO hearings and insofar as it establishes the scope of and the procedures for individual licensing hearings. The November 11, 1975 order, insofar as it allows the granting of interim commercial licenses for mixed oxide fuel related activities, is reversed and remanded to the Commission.

Remanded for proceedings consistent with this opinion.

---

14. Petitioner the State of New York argues that the order violates the requirement set forth in 42 U.S.C. § 5847 that fuel recycle activities be accompanied by appropriate site surveys; see note 5, *supra*. Petitioner notes that such surveys have not been completed and states that the grant of licenses prior to the surveys' completion would violate the statute. In light of

our ruling that no commercial licenses may be granted until completion of the GESMO study, we will assume that the Commission will comply with all relevant site survey requirements, as well as with NEPA, before any licenses are granted. We have discussed petitioner NRDC's Atomic Energy Act claim in note 13.