582 F.2d 166
 11 ERC 1945, 8 Envtl. L. Rep. 20,646
 NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION and United
States of America, Respondents,
Power Authority of the State of New York, et al., American
Electric Power Company, et al., Boston Edison
Company, et al., Pennsylvania Power &
Light Company, Intervenors.
 No. 725, Docket 77-4157.
 United States Court of Appeals,
Second Circuit.
 Argued March 15, 1978.
Decided July 5, 1978.
 
 Ross Sandler, New York City, John Roger Beers, Helene M. Linker, Palo Alto, Cal., for petitioner.
 Peter R. Steenland, Jr., Chief, Appellate Section, Land and Natural Resources Division, U. S. Dept. of Justice, Washington, D. C. (Jerome Nelson, Gen. Counsel, Stephen F. Eilperin, Sol., U. S. Nuclear Regulatory Commission, Washington, D. C.), for respondents.
 
 
 1
 LeBoeuf, Lamb, Leiby & MacRae, Washington, D. C. (Harry H. Voigt, James P. McGranery, Jr., Patrick K. O'Hare, Washington, D. C., Michael I. Miller, John W. Rowe, Isham, Lincoln & Beale, Chicago, Ill., of counsel), for intervenors Power Authority of the State of New York, et al.
 
 
 2
 Wm. Bradford Reynolds, Robert E. Zahler, Washington, D. C. (Shaw, Pittman, Potts & Trowbridge, Washington, D. C., of counsel), for intervenors American Electric Power Co., et al.
 
 
 3
 George C. Freeman, Jr., Donald P. Irwin, Richmond, Va. (Hunton & Williams, Richmond, Va., of counsel), for intervenors Boston Edison Co., et al.
 
 
 4
 Edward M. Nagel, Allentown, Pa., for intervenor Pennsylvania Power & Light Co.
 
 
 5
 Leonard J. Theberge, Washington, D. C. (Myrna P. Field, Mid-Atlantic Legal Foundation, Philadelphia, Pa., L. Manning Muntzing, Raul Robert Tapia, Doub, Purcell, Muntzing & Hansen, Washington, D. C., of counsel), for Amicus curiae Mid-Atlantic Legal Foundation.
 
 
 6
 Kathryn Burkett Dickson, California Energy Resources Conservation and Development Commission, Herbert H. Brown and Lawrence C. Lanpher, Washington, D. C. (Hill, Christopher & Phillips, Washington, D. C., of counsel), for Amicus curiae California Energy Resources Conservation and Development Commission.
 
 
 7
 Before MULLIGAN and GEWIN,* Circuit Judges, and MILLER, Judge.**
 
 MILLER, Judge:
 
 8
 The Natural Resources Defense Council, Inc. ("NRDC") petitions for review of the June 27, 1977, decision of the Nuclear Regulatory Commission ("NRC") denying NRDC's petition for (1) a rulemaking proceeding[1] to determine whether high-level radioactive wastes generated in nuclear power reactors can be Permanently disposed of without undue risk to the public health and safety, and (2) withholding of action on pending and future applications for operating licenses for nuclear power reactors until such time as an affirmative determination has been made. The petition declares that no accepted and approved plan exists for Permanent disposal of high-level radioactive wastes;[2] whereas, under the Atomic Energy Act of 1954 ("AEA") NRC is required to determine that there will be "adequate protection to the health and safety of the public."[3] 42 U.S.C. §§ 2232(a), 2133(b), 2013(d), and 2012(e). Although both at oral argument and in its brief NRDC has denied that its purpose was to stop NRC from issuing operating licenses for nuclear power reactors, it is evident that such would be the result if NRDC's petition were granted, since at this time there is no "accepted and approved plan" for Permanent disposal of high-level radioactive wastes.[4]
 
 In its petition, NRDC argued as follows:
 
 9
 One of the inevitable by-products of operating a nuclear power reactor is the creation of massive amounts of plutonium and other highly radioactive materials. During its projected 40-year life span, a one-thousand megawatt nuclear power plant can be expected to generate eight metric tons of plutonium, as well as millions of curies of other highly toxic radioactive elements. Plainly, a determination that operation of such a reactor will not create undue risk to public health and safety requires a determination that these highly hazardous and long-lived radioactive materials can be disposed of safely.
 
 
 10
 . . . .ter
 
 
 11
 To license a reactor as safe plainly requires the Commission also to determine that the highly hazardous wastes it creates can be handled and Permanently disposed of safely.
 
 
 12
 . . . .se
 
 
 13
 Petitioner alleges that the hazards posed by the radioactive wastes created during the operation of nuclear power reactors when evaluated in the current absence of an acceptably safe plan and means for disposal constitute an extremely significant and undue risk to the public health and safety. Specifically, petitioners allege that no adequately safe disposal plan has been approved and that creation of additional radioactive wastes in new reactors at the present time in the absence of an accepted plan for disposing of these wastes does not provide for adequate protection to the health and safety of the public, in violation of the Atomic Energy Act of 1954. (Footnote omitted; emphasis supplied.)
 
 
 14
 On the other hand, in its notice of denial, NRC concluded that it is neither obligatory nor appropriate that it make the "definitive finding" requested by NRDC, saying:
 
 
 15
 The Commission notes that prior to any licensing of High-level waste disposal facilities, a detailed finding concerning the safety of the proposed facilities will be made. There is, we believe, a clear distinction between Permanent disposal of wastes and their Interim storage. (Emphasis supplied.)
 
 And further:
 
 16
 As part of the licensing process for an individual power reactor facility, the Commission does review the facility in question in order to assure that the design provides for safe methods for interim storage of spent nuclear fuel. But it is neither necessary nor reasonable for the Commission to insist on proof that a means of permanent waste disposal is on hand at the time reactor operation begins, so long as the Commission can be reasonably confident that permanent disposal (as distinguished from continued storage under surveillance) can be accomplished safely when it is likely to become necessary. Reasonable progress towards the development of permanent disposal facilities is presently being accomplished. Under these circumstances a halt in licensing of nuclear power plants is not required to protect public health and safety.
 
 
 17
 In its brief, NRDC argues that to date the federal government has failed to develop any proven means for the safe permanent disposal of radioactive waste; that "there is no guaranty that the federal government can or will ever develop a safe, permanent waste disposal facility"; and that "substantial doubts exist" over whether such disposal will ever be "technically or politically feasible." Therefore, NRDC says it would be "foolhardy to continue to license nuclear power reactors without any regard for whether safe (permanent) waste disposal can be accomplished."
 
 
 18
 However, this does not fairly frame the issue, since, as recognized in the California brief, NRC clearly does have "regard" for whether safe permanent waste disposal can be accomplished, and this notwithstanding that 42 U.S.C. § 2232, which specifies the information to be furnished in applications for "production or utilization facilities," does not require any information from an applicant regarding permanent disposal of high-level waste.[5] Thus, in its notice of denial, NRC stated:
 
 
 19
 The Commission would not continue to license reactors if it did not have reasonable confidence that the wastes can and will in due course be disposed of safely.
 
 Further, it pointed to
 
 20
 the Commission's implicit finding of reasonable assurance that methods of safe permanent disposal of high-level wastes can be available when they are needed. Given this, and the fact that at present safe storage methods are . . . available and highly likely to remain so until a permanent disposal system can be demonstrated and licensed,[6] the Commission sees no reason to cease licensing reactors.
 
 
 21
 The technology for disposal is reasonably available, and the studies done to date, while not conclusive, are nevertheless promising for timely and safe implementation of the technology. Most importantly, ERDA has dramatically expanded the U.S. program for development of a permanent high-level waste repository. . . . ERDA has greatly expanded its program for selection of sites for geologic disposal and is expected to apply to the NRC for a license for such a facility in early 1980[7] or before. . . . Thus, there is now a coordinated Federal program to develop an actual disposal facility. Similarly, the NRC is expanding its own program to set the regulatory requirements for such an operation. The NRC is presently developing a set of regulations to govern licensing of federal repositories to insure that permanent disposal of high-level radioactive wastes will be accomplished safely.
 
 
 22
 Reduced to its essence, the issue in this case is whether NRC, prior to granting nuclear power reactor operating licenses, is required by the public health and safety requirement of the AEA to make a determination (in accordance with its rulemaking procedure) that high-level radioactive wastes can be Permanently disposed of safely. NRDC argues that NRC is so required and that the AEA and ERA (Energy Reorganization Act of 1974) show that Congress so intended. NRC maintains that it need not do so and that its long-continued regulatory practice of issuing operating licenses, with an implied finding of reasonable assurance that safe permanent disposal of such wastes can be available when needed, is in accord with the intent of Congress underlying the AEA and ERA; also, that in denying NRDC's petition, the NRC did not act arbitrarily or capriciously.
 
 
 23
 NRDC would find a congressional mandate for an affirmative determination regarding permanent disposal of high-level waste in 42 U.S.C. § 2133(d), which provides that no license (for utilization or production facilities for industrial or commercial purposes) may be issued if such issuance "would be inimical to the . . . health and safety of the public." This is NRC's response:
 
 
 24
 By 1959, with commercial power plants under construction but not yet licensed for operation, the Joint Committee (on Atomic Energy) decided to hold extensive hearings devoted exclusively to the problem of radioactive waste disposal. "Industrial Radioactive Waste Disposal" Hearings before the Special Subcommittee on Radiation of the Joint Committee on Atomic Energy, Vols. I-V, 86th Cong., 1st Sess. (1959). There was at the time a considerable volume of high level waste which had been generated as a result of the military weapons program and was being stored in tanks at Hanford, Washington, and Savannah River, South Carolina. The Atomic Energy Commission (AEC) described its waste storage practices at these facilities, 14 and the AEC's licensing program for commercial power plants. 15 A number of witnesses described the possible future problems implicated by the commercialization of nuclear power that was then only in its infancy. Id. at 7-32, 1825-1844, 2426-2438. That the wastes were an inevitable consequence of nuclear power operation and would increase with time was clearly recognized, and indeed was the principal fact that occasioned the hearings. 16 Representative Holifield (Chairman of the Special Subcommittee (of the Joint Committee on Atomic Energy) on Radiation) remarked at the outset (Id. at 12):
 
 
 25
 . . . .imo
 
 
 26
 The public should know that the Atomic Energy Commission has been alerted to this problem (high-level waste) and has been very diligent, in my opinion, in handling it on the only basis they know how to handle it, which is a temporary method of containment and custody.
 
 
 27
 They also should know this is a field where a permanent solution has not been found.
 
 
 28
 Thus, it is clear that from the very beginnings of commercial nuclear power the Congress was aware of the absence of a permanent waste disposal facility, but decided to proceed with power plant licensing. (Footnotes 12 and 13 omitted.)
 
 
 29
 Citing numerous reports of hearings before the Joint Committee on Atomic Energy,[8] NRC observes that since 1959 the question of waste disposal has been reviewed by the Committee almost every year. Further
 
 
 30
 The Joint Committee was kept abreast of the AEC's waste management program, understood the measures that were being taken for storage of the wastes, and considered these measures adequate for the protection of the public health and safety. While the problems of waste disposal were the subject of constant and intensive concern, they were not thought of as immediate safety issues. Rather, waste disposal issues were considered to be ones calling for long term research and study, and eventual solution. See generally, 1964 Hearings, at 399-400; 1965 Hearings at 873-876, 1214-1220; 1969 Hearings on AEC Authorizations at 1023; 1970 Hearings, at 1424-1427.[9]
 
 
 31
 It is our conclusion that NRDC simply reads too much into the AEA. Indeed, if the AEC had interpreted the statute to require the affirmative determination regarding permanent disposal of high-level waste sought by NRDC, no commercial production or utilization facilities would be in operation today. We are satisfied that Congress did not intend such a condition. If it did, the silence from Capitol Hill has been deafening. It is incredible that AEC and its successor NRC would have been violating the AEA for almost twenty years with no criticism or statutory amendment by Congress, which has been kept well informed of developments. Administrative interpretation, practice, and usage are accorded "great weight as an extrinsic aid in the interpretation of statutes by the courts." 3 Sutherland Statutory Construction § 65.05 (4th ed. 1974). "Executive construction is entitled to additional weight where it has been impliedly indorsed by the legislature, as . . . by the failure of the legislature, with knowledge of such construction, to change the law or adopt amendments (footnotes omitted)." 82 C.J.S. Statutes § 359 at 769 (1953). Particularly is this so when the agency involved has adopted "a reasonable, if indeed not a compelling, construction of the statute." NLRB v. Coca-Cola Bottling Co., 350 U.S. 264, 269, 76 S.Ct. 383, 386, 100 L.Ed. 285, 290 (1956). The Supreme Court's statement in Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers, 367 U.S. 396, 409, 81 S.Ct. 1529, 1536, 6 L.Ed.2d 924, 932 (1961), is especially pertinent:
 
 
 32
 It may often be shaky business to attribute significance to the inaction of Congress, but under these circumstances, and considering especially the peculiar responsibility and place of the Joint Committee on Atomic Energy in the statutory scheme, we think it fair to read this history as a De facto acquiescence in and ratification of the Commission's licensing procedure by Congress.
 
 
 33
 What is required is that there be "warrant in the record" and "a reasonable basis in law" for the agency's determination, and that requirement is clearly satisfied by the record before us. See NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170, 1184 (1944).
 
 
 34
 " Courts are slow to disturb the settled administrative construction of a statute, long and consistently adhered to. . . . That construction must be accepted and applied by the courts when . . . it has received Congressional approval, implicit in the annual appropriations over a period of . . . (many) years . . . ." Alaska Steamship Co. v. United States, 290 U.S. 256, 262, 54 S.Ct. 159, 161, 78 L.Ed. 302, 305 (1933). Only recently the Supreme Court, in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., --- U.S. ----, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), reemphasized the limited role of the courts in reviewing agency procedures and actions. Reversing the U.S. Court of Appeals for the District of Columbia Circuit, it said (Id. at 1217) the court had forgotten the injunction in Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576, 590 n.21 (1976), and "unjustifiably intruded into the administrative process," thus:
 
 
 35
 Neither the statute (NEPA) nor its legislative history contemplates that a court should substitute its judgment for that of an agency as to the environmental consequences of its actions.
 
 
 36
 See also FCC v. Schreiber, 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383, 391 (1965).
 
 
 37
 NRDC cites this court's decision in Natural Resources Defense Council, Inc. v. NRC, 539 F.2d 824 (2d Cir. 1976), Vacated and remanded, 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978), as recognition of "the need for a full advance assessment of the environmental impacts of a new and hazardous nuclear technology prior to its licensing." In that case, this court reversed a 1975 order of NRC "insofar as it allows the granting of interim commercial licenses for mixed oxide fuel related activities" before completion of NRC's generic environmental impact study and final decision on the widespread use of such fuel. The court said (Id. at 845) that the order would "circumvent" the mandates of the National Environmental Policy Act of 1969 ("NEPA"). However, unlike the AEA, NEPA clearly requires such a study,[10] and the court obviously thought that alternatives to plutonium recycle should be considered before there was a commitment of resources in interim licensing.[11] See also Natural Resources Defense Council, Inc. v. Callaway, 524 F.2d 79, 92 (2d Cir. 1975).
 
 
 38
 NRDC argues that there is no evidence that anyone ever "forcefully" brought to Congress' attention the matter presented by this appeal. However, the awareness of Congress needed to support its tacit approval of agency action is not required to be measured in decibels. Indeed, NRDC even argues that "Congress was never specifically advised by the NRC, its predecessor, or anyone else that determinations of the feasibility of radioactive waste disposal were not being conducted in connection with decisions to continue reactor licensing" and that "testimony was on occasion presented to Congress from which it could have inferred that the NRC's safety determination did include a review of this question." For example, it states that during the hearings on legislation to establish the Department of Energy, "an NRC representative advised a Senate Committee of the filing of NRDC's petition herein with the NRC . . . but then reassured the Committee that this safety review function was in fact being performed by the NRC," quoting from the testimony as follows:
 
 
 39
 NRC currently licenses nuclear power reactors with the understanding that the wastes from these reactors can and will be disposed of without risk to the public health and safety. Our confidence that these wastes will be disposed of adequately is based in part on knowledge of the momentum and priorities of ERDA's programs on nuclear waste management. Change in the timing and priorities then of ERDA's programs could impact the position that the Commission has held thus far on this issue. Hearings on S. 826 and S. 591 before Senate Committee on Governmental Affairs, 95th Cong., 1st Sess. 867 (1977).
 
 
 40
 NRC contends that the quoted statement (by Dr. C. V. Smith, Jr., Director, Division of Fuel Cycle and Material Safety for Nuclear Regulatory Commission) was taken out of context. There appears to be support for this contention in Dr. Smith's earlier testimony (Id. at 866-67) that
 
 
 41
 the ERDA goal is to have an operating high-level waste repository at the soonest possible time, namely 1985. The NRC regulatory program is closely coordinated with the ERDA development program to achieve that goal. . . . (P) erhaps the most troublesome aspect to this Commission . . . is the issue of whether reactors should continue to be built and licensed in the absence of demonstrated high-level waste disposal facilities. It is a question which has been posed publicly in a variety of forms. . . . Several State referendums have centered on this issue, and indeed the Natural Resources Defense Council has petitioned NRC to make a definitive finding that waste from reactors will be disposed of ultimately in a safe manner.
 
 
 42
 As another example, NRDC states that "in 1959 an AEC representative (H. L. Price, Director, Division of Licensing and Regulation, U.S. Atomic Energy Commission) testified in congressional hearings that 'each applicant for a license to construct and operate a nuclear facility' must provide certain information 'which will provide, to the Commission's satisfaction, reasonable assurance that the licensed activity will not present undue risk to public health and safety, either from accidental release of radioactive materials or release from routine operations or From disposal of radioactive waste.' " (Citing Hearings on Industrial Radioactive Waste Disposal Before Subcomm. on JCAE, 86th Cong., 1st Sess. 2512 (1959); emphasis added.) However, we note that on the very next page, Director Price stated:
 
 
 43
 For the foreseeable future, all high-level waste resulting from processing of spent fuel elements from licensed reactors will be returned to the Commission for processing and handling.
 
 
 44
 Obviously, information (from an applicant for a license to operate a nuclear reactor) with respect to disposal of radioactive waste would not include disposal of high-level waste returned to the Commission. Director Price said further (Id. at 2516):However, as additional reactors go into operation and the use of radioactive isotopes increases, the trend will be toward ever-increasing quantities of waste. The disposal of large volumes of radioactive waste presents complex problems. It will be necessary to continue to support research work in such areas as sea disposal . . . .
 
 
 45
 In 1970, NRC (then AEC) promulgated a regulatory "Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities "[12] under which high-level waste at separately licensed fuel reprocessing plants (in which spent fuel is processed to yield usable fuel, both uranium and plutonium, and high-level waste) is to be transferred to a federal government repository for permanent storage. On April 7, 1977, the President reported that there are no reprocessing plants licensed to operate, and that further study is being conducted on nuclear fuel cycle alternatives to plutonium recycle. 13 Weekly Comp. of Pres. Doc. 506-07 (1972). Most spent fuel is stored in pools at reactor sites, although there are other (interim) storage facilities mainly used for nuclear wastes generated by the United States nuclear weapons program, the volume of which greatly exceeds that of the electric power industry. See Hearings on Radioactive Waste Management ("Assessing the Policies, Plans, and Programs of the Executive Branch and the Nuclear Regulatory Commission for the Safe Storage and Disposal of Radioactive Wastes Produced in the Commercial Nuclear Fuel Cycle"), Before the Subcomm. on Environment and Safety of the JCAE, 94th Cong., 2d Sess. 26, 123-24 (1976).
 
 
 46
 Finally, if there were any doubt over the intent of Congress (1) not to require NRC to make the definitive determination requested by NRDC and (2) not to require a moratorium on nuclear power reactor licensing pending an affirmative determination, we are persuaded that the matter was laid to rest by enactment of the Energy Reorganization Act of 1974, Pub.L. No. 93-438, 88 Stat. 1233. 42 U.S.C. §§ 5801 et seq. Therein, Congress expressly recognized and impliedly approved NRC's regulatory scheme and practice under which the safety of interim storage of high-level radioactive wastes at commercial nuclear power reactor sites has been determined separately from the safety of Government-owned permanent storage facilities which have not, as yet, been established.[13] While not delaying or stopping reactor licensing, notwithstanding such testimony as that from the Union of Concerned Scientists, Friends of the Earth, and other groups, Supra note 9, Congress provided for NRC review of such future projects of the Energy Research and Development Administration as facilities "used primarily for the receipt and storage of high-level radioactive wastes resulting from activities licensed under . . . (the Atomic Energy) Act . . . and other facilities authorized for the express purpose of subsequent long-term storage of high-level radioactive waste generated by the Administration." 42 U.S.C. §§ 5842(3) and (4).
 
 
 47
 We are not without appreciation of the well-intentioned concerns of NRDC[14] and of the General Accounting Office in its September 9, 1977, report to the Congress, The United States Nuclear Energy Dilemma: Disposing of Hazardous Radioactive Wastes Safely.[15] However, it is for the Congress rather than the courts to translate such concerns into law. NRDC makes the point that "serious political and social resistance to the development of a geologic repository is mounting throughout the country," and that "ten states already have introduced bills banning high-level waste disposal repositories within their borders." Nevertheless, resolving the problem of such "resistance" must come from the legislative branch of government. As the Supreme Court recently remarked: "Time may prove wrong the decision to develop nuclear energy, but it is Congress or the States within their appropriate agencies which must eventually make that judgment." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., supra at ----, 98 S.Ct. at 1219, 55 L.Ed.2d at ---.
 
 
 48
 In view of the foregoing, we hold that NRC is not required to conduct the rulemaking proceeding requested by NRDC or to withhold action on pending or future applications for nuclear power reactor operating licenses until it makes a determination that high-level radioactive wastes can be permanently disposed of safely; further, that NRC's denial of NRDC's petition was not arbitrary or capricious. See Consumers Union of United States, Inc. v. Consumer Product Safety Comm'n, 491 F.2d 810, 812 (2d Cir. 1974).
 
 
 49
 The petition for review is denied.
 
 
 
 *
 The Honorable Walter P. Gewin, United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 **
 The Honorable Jack R. Miller, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 See 10 C.F.R. §§ 2.800 et seq
 
 
 [2]
 Both petitioner and NRC consider the phrase "high-level radioactive wastes" to mean: (1) high-level wastes as defined in 10 C.F.R. § 50, App. F (aqueous wastes resulting from the first cycle solvent extraction system and concentrated wastes from subsequent extraction cycles), (2) spent fuel rods, and (3) transuranic-contaminated wastes
 
 
 [3]
 Absolute or perfect assurances concerning public health and safety "are not required by AEA, and neither present technology nor public policy admit of such a standard." Citizens for Safe Power, Inc. v. NRC, 173 U.S.App.D.C. 317, 323, 524 F.2d 1291, 1297 (1975)
 
 
 [4]
 We acknowledge briefs in support of NRC filed by intervenors Power Authority of the State of New York, Rochester Gas and Electric Corporation, Niagara Mohawk Power Corporation, Public Service Company of Indiana, Inc., Commonwealth Edison Co., Exxon Nuclear Co., Inc., and by intervenors American Electric Power Co., Baltimore Gas & Electric Co., Boston Edison Co., Consumers Power Co., Duquesne Light Co., Jersey Central Power & Light Co., Kansas City Power & Light Co., Kansas Gas & Electric Co., Long Island Lighting Co., Madison Gas & Electric Co., Metropolitan Edison Co., Northeast Nuclear Energy Co., Northern States Power Co., Ohio Edison Co., Pacific Gas & Electric Co., Pennsylvania Power & Light Co., Philadelphia Electric Co., Public Service Electric & Gas Co., Southern California Edison Co., The Cleveland Electric Illuminating Co., The Connecticut Light & Power Co., The Hartford Electric Light Co., The Toledo Edison Co., Union Electric Co., Virginia Electric & Power Co., Western Massachusetts Electric Co., Wisconsin Electric Power Co., Wisconsin Power & Light Co., Wisconsin Public Service Corp., Yankee Atomic Electric Corp., and by Mid-Atlantic Legal Foundation as Amicus Curiae ; also a brief in support of NRDC filed by California Energy Resources Conservation and Development Commission ("California") as Amicus Curiae
 
 
 [5]
 Neither does the pertinent NRC regulation, which was first promulgated December 17, 1968 (33 Fed.Reg. 18612), 10 C.F.R. § 50.34
 
 
 [6]
 Citing, for example, approval of 19 of 32 applications for more compact on-site spent fuel storage, NRC states that such storage capacity is being planned for up through the year 2000
 
 
 [7]
 The President's Statement on Nuclear Policy, 12 Weekly Comp. of Pres.Doc. 1624 (Oct. 28, 1976), called for development and demonstration of the facility by 1985. The system contemplates disposal in bedded salt formations. However, NRC calls attention to a study by its Office of Nuclear Material Safety and Safeguards which indicates that argillaceious and crystalline rock formations are also being studied
 
 
 [14]
 1959 Hearings on Industrial Radioactive Waste Disposal at 159-170 (Hanford), 428-460 (Oak Ridge), 579-584 (National Reactor Testing Station), 598-609, 987-995
 
 
 [15]
 Id. at 2509-2522. Witnesses from the AEC described their research on proposals for permanent waste disposal systems, including deep geologic isolation in abandoned salt mines and ocean disposal. Id. at 1825-1860, 2028-2041 (sic 2043), 2087-2280, 2345-2358
 
 
 [16]
 See testimony of AEC witnesses, Id. at 458-459, 607-609, 989-991, and testimony of Dr. Wolman, Johns Hopkins University, Id. at 10, 2428
 
 
 [8]
 Hearings on Development, Growth, and State of Atomic Energy Industry Before the Joint Comm. on Atomic Energy ("JCAE"), 87th Cong., 1st Sess. 15-16 (1961); Hearings on AEC Authorizing Legislation, Fiscal Year 1963, Before the JCAE, 87th Cong., 2d Sess. 97-98 (1962); Hearings on AEC Authorizing Legislation, Fiscal Year 1964, Before the JCAE, 88th Cong., 1st Sess. 32-40 (1963); Hearings on AEC Authorizing Legislation, Fiscal Year 1965, Before the JCAE, Part 1, 88th Cong., 2d Sess. 399-406 (1964); Hearings on AEC Authorizing Legislation, Fiscal Year 1966, Before the JCAE, Part 2, 89th Cong., 1st Sess. 873-76, 1214-20 (1965); Hearings on AEC Authorizing Legislation, Fiscal Year 1969, Before the JCAE, Part 1, 90th Cong., 2d Sess. 704 (1968); Hearings on Environmental Effects of Producing Electric Power Before the JCAE, Part 1, 91st Cong., 1st Sess. 121-23, 135-36 (1969); Hearings on AEC Authorizing Legislation, Fiscal Year 1970, Before the JCAE, Part 2, 91st Cong., 1st Sess. 969-74, 1021-28 (1969); Hearings on AEC Authorizing Legislation, Fiscal Year 1971, Before the JCAE, Part 3, 91st Cong., 2d Sess. 1424-28 (1970); Hearings on AEC Authorizing Legislation, Fiscal Year 1972, Before the JCAE, Part 3, 92d Cong., 1st Sess. 1307-2235 (1971); Hearings on Nuclear Reactor Safety Before the JCAE, 93d Cong., 1st Sess., Part 1, 179-278, Part 2, 72-74, 86-89, 107-08 (1973); Hearings on Nuclear Power Plant Siting and Licensing Before the JCAE, 93d Cong., 2d Sess. 130, 567, 572-73 (1974); Hearings on Storage and Disposal of Radioactive Waste Before the JCAE, 94th Cong., 1st Sess. 18 (1975); Hearings on Radioactive Waste Management Before the Subcomm. on Environment and Safety of the JCAE, 94th Cong., 2d Sess. 20-21 (1976); Hearings on ERDA Authorizing Legislation, Fiscal Year 1977, Before the Subcomm. on Legislation of the JCAE, Part 2, 94th Cong., 2d Sess. 1440-45 (1976). See also Oversight Hearings on Nuclear Energy, Subcomm. on Energy and the Environment, House Comm. on Interior and Insular Affairs, 94th Cong., 1st Sess. (1975); Report of the Senate Comm. on Government Operations on Legislation Establishing the Energy Research and Development Administration, S.Rep.No.93-980, 93d Cong., 2d Sess. 60 (1974)
 
 
 [9]
 We note that at the 1973 and 1974 hearings, the Union of Concerned Scientists, Friends of the Earth, and other groups urged Congress, unsuccessfully, to halt further commercial power plant licensing pending resolution of the waste disposal issue. 1973 Hearings, Part 2, Supra note 8 at 72-74, 86-89, 107-08; 1974 Hearings, Supra note 8 at 130, 567, 572-73. Instead, Congress asked the AEC to devote greater priority to waste management and did not see fit to postpone reactor licensing
 
 
 [10]
 42 U.S.C. § 4332 provides in pertinent part that
 all agencies of the Federal Government shall
 . . . .cie
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 See also 10 C.F.R. Part 51, Subpart A.
 
 
 [11]
 The court also said, Supra at 838-39, that an agency has broad discretion over the nature and scope of proceedings to resolve complex matters within its jurisdiction
 
 
 [12]
 10 C.F.R. Part 50, App. F provides in pertinent part as follows:
 
 
 [1]
 Public health and safety considerations relating to licensed fuel reprocessing plants do not require that such facilities be located on land owned and controlled by the Federal Government. Such plants, including the facilities for the temporary storage of high-level radioactive wastes, may be located on privately owned property
 
 
 [2]
 A fuel reprocessing plant's inventory of high-level liquid radioactive wastes will be limited to that produced in the prior 5 years. . . . High-level liquid radioactive wastes shall be converted to a dry solid as required to comply with this inventory limitation, and placed in a sealed container prior to transfer to a Federal repository in a shipping cask meeting the requirements of 10 CFR Part 71. . . . All of these high-level radioactive wastes shall be transferred to a Federal repository no later than 10 years following separation of fission products from the irradiated fuel. Upon receipt, the Federal repository will assume permanent custody of these radioactive waste materials although industry will pay the Federal Government a charge which together with interest on unexpended balances will be designed to defray all costs of disposal and perpetual surveillance. NRC will take title to the radioactive waste material upon transfer to a Federal Repository. . . . Federal repositories, which will be limited in number, will be designated later by the Commission
 
 
 [3]
 Disposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government
 An informative and somewhat detailed statement of NRC's policy was published with the regulation at 35 Fed.Reg. 17530 (1970).
 
 
 [13]
 As quoted earlier, NRC "would not continue to license reactors if it did not have reasonable confidence that the wastes can and will in due course be disposed of safely." Clearly the Congress has, to date, shared that confidence
 
 
 [14]
 NRDC urges that even if reasonable assurance of safe future disposal of waste could be demonstrated, "the full incentive to develop such a facility on a timely basis will not be present unless the regulatory link is made now between reactor licensing and waste disposal." This is the kind of argument that is properly made to the Congress
 
 
 [15]
 The report said:
 The unsolved problem of radioactive waste disposal threatens the future of nuclear power in the United States. Nuclear critics, the public, business leaders, and Government officials concur that a solution to the disposal problem is critical to the continued growth of the nuclear energy.